IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:08-md-1932-MU

| IN RE FAMILY DOLLAR | ) | |
|---|---|---|
| FLSA LITIGATION | ) | |
| | ) | |
| | ) | **ORDER** |
| | ) | |
| *Concerning McCarty v. Family Dollar* | ) | |
| *Stores* | ) | |
| | ) | |
| Case No. 3:08-cv-1934 | ) | |
| | ) | |

**THIS MATTER** is before the Court on Defendant's Motion for Summary Judgment and Memorandum in Support (Doc. No. 909); Plaintiff's Response in Opposition (Doc. No. 928); and Defendant's Reply (Doc. No. 940). For the reasons set forth below, the motion is **GRANTED**.

## FACTS

Plaintiff, Claude Carlile, began working for Family Dollar in 1987, first working briefly as a stocker and then moving into a management trainee position.[1] (Doc. No. 910, Carlile Dep. at 43-44.) In 1987, Carlile was promoted to Store Manager of the Texarkana, Texas Store (Store 998), where Carlile remained Store Manager at all times during the relevant time period for his

---

[1] The Court notes that Plaintiff's declaration was prepared after Plaintiff's deposition and on many occasions directly contradicts his sworn testimony. Plaintiff cannot create a dispute about a fact contained in deposition testimony by referring to a subsequent affidavit of the deponent contradicting the deponent's prior testimony, for "it is well established that a genuine issue of fact is not created where the only issue of fact is to determine which of the two conflicting versions of a party's testimony is correct." *Erwin v. United States*, 591 F.3d 313, 325 n.7 (4th Cir. 2010) (internal quotation marks and alterations omitted) (quoting *Halperin v. Abacus Tec. Corp.*, 128 F.3d 191, 198 (4th Cir. 1997); *see also Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 341 (4th Cir. 2001); *Rohrbough v. Wyeth Labs.*, 916 F.2d 970, 975-76 (4th Cir. 1990); *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984). To the extent that Plaintiff's deposition testimony and later affidavit are inconsistent, the Court will disregard the affidavit and rely on the testimony he gave in his deposition, where he was examined at length about his responsibilities and a manager of a Family Dollar store. *See Grace*, 637 F.3d at 513.

1

claims.[2]  (Doc. No. 910, Carlile Dep. at 50, 63; DeBrocq Decl. ¶ 4.)  When Carlile first became a Store Manager, he was trained on various tasks, including handling the store's cash, deposits, and sales records, schematics, and how to handle cash register voids and refunds.  (Carlile Dep. at 53-54, 62.)

As Store Manager, Carlile was the highest paid employee in the store.  (*Id*. at 60; DeBrocq Decl. ¶ 4.)  Family Dollar paid Carlile a weekly salary of: $845 from January 25, 2005 to May 30, 2005; $866.67 from May 30, 2005 to May 23, 2006; $888.33 from May 23, 2006 to May 28, 2007; and $905.57 from May 28, 2007 until the end of his employment on August 18, 2007.  (DeBrocq Decl. ¶ 4.)  Carlile also earned bonuses of $2,313.82 in 2005, $2,646.87 in 2006, and $2,422.00 in 2007.  (Carlile Dep. at 60, 69-70; DeBrocq Decl. ¶ 5.)  Nonexempt employees were not eligible for these bonuses, which were tied to the store's performance as measured at inventory time.  (*Id*.)  Carlile worked an average of 70 hours per week as store manager.  (DeBrocq Decl. ¶ 6.)

The record shows that of the twenty-six nonexempt employees who worked at Carlile's store during the relevant time period, twenty-three made $6 per hour or less, and the highest paid nonexempt employee earned only $7.50 per hour.  (*Id*. at ¶ 9.)  Even using the highest hourly wages earned by employees whose wages changed over time, the hourly employees who worked in Carlile's store earned an average of $5.77 per hour during the relevant time period.  (*Id*.)  Family Dollar's records reflect that Carlile managed at least 80 employee hours 100% of the time during the relevant time period.  (*Id*. at ¶8.)  Carlile typically had five total employees in his store, and on most days he worked with two Assistant Store Managers and a cashier.  (Carlile

---

[2] Carlile filed his opt-in consent form on January 25, 2008.  Accordingly, January 25, 2005, or three years prior to his opt-in date, through the end of his employment on August 18, 2007, represents the longest possible relevant time period for Carlile's claims in this action.

Dep. at 99-101.) Carlile resigned on August 18, 2007 in order to take a job as store manager with Fred's. (*Id*. at 30-33.) Carlile was recruited and hired based on his experience running his Family Dollar store and because the Fred's representative liked what he saw in Carlile's Store. (*Id*.)

Carlile contends that he devoted 90-95% of his time to performing nonexempt work, but also admits that he was responsible for running the store. (*Id*. at 68; DeBrocq Decl. ¶¶ 4, 7.) For example, Carlile admitted that even when he was performing non-managerial tasks in the store, he concurrently was responsible for the store's security by watching for shoplifters, supervising and directing his employees, and occasionally addressing customer issues. (Carlile Dep. at 88-89.) Carlile also had the authority and ability to direct other employees to perform this nonexempt work. (*Id*. at 89.)

Carlile was responsible for many tasks and duties as part of his job. Specifically, Carlile was responsible for: interviewing and screening employees and providing hiring recommendations, including as to their starting pay (*Id*. at 56-59, 93-99.); completing the hiring paper work (*Id*. at 23-26.); training employees (*Id*. at 78, 98-99.); ensuring that Family Dollar procedures were being followed (*Id*. at 67-69, 107-108.); scheduling employees (*Id*. at 104-05.); handling vacation requests and occasions when employees failed to show up for work (*Id*. at 104-05, 151-53.); supervising and directing employees' work (*Id*. at 73-74.); maintaining financial and sales paperwork and handling the bank deposits (*Id*. at 54, 131-33, 138.); evaluating the work of his employees and recommending promotions (*Id*. at 16-18, 145.); handling employee complaints and conflicts (*Id*. at 165-71.); counseling and disciplining employees when necessary (*Id*. at 83-89.); planning and apportioning work among his employees (*Id*. at 101.); maintaining the security of the store and guarding against theft (*Id*. at 10-11.);

ensuring that the store stayed within the allocated payroll budget (*Id*. at 122-23.); and monitoring legal compliance measures with respect to hiring. (*Id*. at 140-48.)

Carlile testified that he determined whether a candidate should move forward in the hiring process. (*Id*. at 56-58, 93-94, 97, 141-44.) If Carlile did not believe that a candidate would be a good fit at the store, he simply placed the application in a file at the store, rather than moving the candidate forward in the hiring process by recommending the hire to his district manager. (*Id*. at 56-58, 97, 143-44.) Carlile cannot recall a single instance where one of his hiring recommendations was not followed by his District Manager. (*Id*. at 57-58.) Carlile also recommend that Betty Brown, Amy Bowen, and Paula Missildine each be promoted to Assistant Store Manager and his District Manager followed each of these recommendations. (*Id*. at 16-18, 94-96, 165-66.)

As store manager, Carlile reported to a district manager. Carlile testified that his district manager, Rick Pardue, visited the store once every two weeks, and would stay for approximately six hours. (*Id*. at 47-48, 61, 83.) Family Dollar's records indicate that during the relevant time period, Carlile's district manager oversaw 18 stores throughout Texas, Oklahoma, and Arkansas, including the store managed by Carlile, spanning a territory of approximately 152 miles from north to south and 136 miles from east to west. (DeBrocq Decl. ¶ 7.)

## **STANDARD OF REVIEW**

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party always bears the initial burden of "informing the district court of the basis for its motion," and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material

4

fact." *Celotex*, 477 U.S. at 323. Once the movant has met the initial burden, "the non-moving party 'may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.'" *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). This is particularly important where the nonmoving party bears the burden of proof. *Hughes*, 48 F.3d at 1381. A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id*. at 249-50. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. at 248. "The determination of whether an employee falls within the scope of a FLSA exemption is ultimately a legal question," *Walton v. Greenbrier Ford, Inc.*, 370 F.3d 446, 450 (4th Cir. 2004), and the Fourth Circuit has repeatedly affirmed the grant of summary judgment where the facts demonstrate that an employee is exempt. *See, e.g., Grace v. Family Dollar Stores, Inc.*, 637 F. 3d 508 (4th Cir. 2011) (affirming grant of summary judgment and holding that Family Dollar Store Manager was exempt executive); *Darveau v. Detecon, Inc.*, 515 F.3d 334 (4th Cir. 2008); *Jones v. Virginia Oil Co., Inc.*, 69 Fed. Appx. 633 (4th Cir. 2003); *Smith v. First Union National Bank*, 202 F.3d 234 (4th Cir. 2000).

## **DISCUSSION**

The Fair Labor Standards Act ("FLSA") requires that an employee receive overtime pay if he or she works more than forty hours a week. 29 U.S.C. § 207(a)(1). The FLSA, however,

5

exempts from this requirement "any employee employed in a bona fide executive…capacity." 29 U.S.C. § 213(a)(1). The Department of Labor ("DOL") has promulgated regulations which further describe and interpret the scope of this exemption.

The current regulations provide that an employee qualifies as an executive if: (1) he is compensated on a salary basis at a rate of at least $455 per week; (2) his primary duty is management of the enterprise; (3) he customarily and regularly directs the work of two or more other employees; and (4) he has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100(a) (2004). The DOL has also promulgated additional regulations which further describe and define these tests; these additional regulations are discussed below. In light of these regulations, Carlile qualifies as an exempt executive.

### 1. Family Dollar Satisfies the Salary Basis Test

Throughout the relevant time period that Carlile was the store manager, Family Dollar paid him a salary between $845 and $905.57 per week. (DeBrocq Decl. ¶ 4; Carlile Dep. at 69.) Therefore, Family Dollar satisfies the salary basis test, which requires a weekly salary of not less than $455 per week. 29 C.F.R. § 541.100(a).

### 2. Family Dollar Satisfies the Primary Duty Test

The regulations provide guidance as to how an employee's primary duty may be determined.[3] The regulations instruct that the determination should be "based on all the facts in

---

[3] The Court finds Carlile's argument that he was merely a "working foreman" unavailing. The current regulations state that a "*manager in a retail establishment*" can "supervise employees and serve customers at the same time without losing the exemption." 29 C.F.R. § 541.106(b) (emphasis added). Section 29 C.F.R. § 541.106(c) states "[i]n contrast, " a "working supervisor" who performs "nonexempt work *on the production line in a manufacturing plant* does not become exempt" merely by occasionally directing the work of other nonexempt employees on the "*production line*." (emphasis added).

a particular case." 29 C.F.R. § 541.700(a). The regulations set forth, but are not limited to, four factors to consider in this analysis: (1) the amount of time spent in the performance of managerial duties; (2) the relative importance of the managerial duties as compared with other types of duties; (3) the relative freedom from supervision; and (4) the relationship between the manager's salary and the wages paid to other employees for the kind of nonexempt work performed by the supervisor. (*Id.*)

Upon consideration of the factors identified for determining whether Carlile's primary duty was management, the Court concludes that the factors are readily satisfied.

### a. The Amount of Time Spent in Performance of Managerial Duties

The regulations provide a list of "management" activities, which include, but are not limited to:

> Interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work, maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked, and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the [employees] and the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.[4]

29 C.F.R. § 541.102.

---

[4] An employee need not perform all management duties listed in the regulations, or evenly regularly perform such duties, in order to be considered an exempt executive. *See Aguirre v. SBC Communs., Inc.*, 2007 U.S. Dist. Lexis 72666, 63-62 (S.D. Tex. Sept. 30, 2007) (finding that "plaintiffs' 'primary duty' for purposes of the executive exemption was 'management,' despite the fact that the plaintiffs did not perform other 'managerial' duties listed in Section 541.102.").

Carlile explicitly testified that he performed *almost every one* of these management activities as a Family Dollar Store Manager.[5] For example, Carlile interviewed and screened potential employees and provided hiring recommendations (Carlile Dep. at 56-58, 93-94, 97, 141-44.); trained his employees, including training on Family Dollar policies and procedures (*Id*. at 67-69, 78, 97-99, 107-08.); assigned employees to a schedule and set their hours of work, including having to adjust the schedule if employees failed to show up for work, or requested time off (*Id*. at 104-05, 151-53.); and directed and supervised his employees' work. (*Id*. at 73-74, 83-83, 88-89, 167-69.) In addition, Carlile maintained and was responsible for certain sales and financial records, as well as bank deposits (*Id*. at 54, 131-33, 138, 170-71.); evaluated the work of his employees for the purpose of recommending promotions (*Id*. at 16-18, 94-96, 145, 165-68.); handled employee complaints and conflicts (*Id*. at 169-70.); disciplined employees when necessary by providing verbal coaching and discipline, then made recommendations to his district manager, which his district manager followed, if he felt further discipline was warranted (*Id*. at 58-59, 84-87, 145-47.); and planned and apportioned work among his employees. (*Id*. at 74, 89, 101, 168-69.) Furthermore, Carlile was responsible for the safety and security of the store (*Id*. at 88.); controlling and staying within the allocated payroll budget (*Id*. at122-23.); and monitoring legal compliance measures with respect to hiring, such as completing I-9 paperwork. (*Id*. at 23-26, 67-69, 140, 147-48.)

---

[5] The fact that the Assistant Managers can perform the same tasks as Carlile does not render his tasks and duties any less managerial. Courts have consistently held that the fact that a non-exempt employee may sometimes perform exempt duties does not make these duties any less exempt/managerial. *See Baldwin v. Trailer Inns., Inc.*, 266 F.3d 1104, 1115 (9th Cir. 2001) ("[t]hat the [non-exempt] assistant managers may have performed some managerial tasks does not render the tasks non-exempt.").

Carlile cannot overcome the exemption by claiming that he spent the majority of his time performing non-managerial duties. The regulations state that an employee who spends more than fifty percent of his or her time performing managerial work will typically satisfy the primary duty requirement. 29 C.F.R. § 541.700(b). The regulations, however, also emphasize that "time alone…is not the sole test" and that exempt executives are not required to spend more than fifty percent of their time performing exempt work if other factors support the conclusion that management is their primary duty.[6] *Id*. In *Grace*, the Fourth Circuit explained that "[t]here is no per se rule that once the amount of time spent on manual labor approaches a certain percentage, satisfaction of this factor is precluded as a matter of law." 637 F.3d 508, 515 (4th Cir. 2011).

The regulations also specifically address the concept of concurrent duties. 29 C.F.R. § 541.106. Concurrent performance, or multi-tasking, of exempt and nonexempt work is explicitly recognized as a managerial duty by the DOL's regulations. *Id*.; *see also* 29 U.S.C. § 213(a)(1).[7] "It is misleading simply to add up the time that [Plaintiff] spent unloading trucks, stocking inventory, running cash registers, or sweeping floors and conclude thereby that she was merely a clerk and not a manager." *Grace*, F.3d at 516.

Carlile was ultimately responsible for the performance of the store and remained the highest ranking employee in the store, even while performing nonexempt work. (Carlile Dep. at

---

[6] The Court disagrees with Carlile's contention that failure to meet the 50 percent threshold means that an employee fails to satisfy the primary duty requirement. The Fourth Circuit clarified the application of the 50 percent "rule of thumb" by stating that, "[i]t is clear from this language that primary duty is meant to be assessed by the totality of the circumstances." *Counts v. S.C. Elec. & Gas Co.*, 317 F.3d 453, 456 (4th Cir. 2003). Carlile's reliance on *Clark v. J.M. Benson Co., Inc.*, 789 F.2d 282 (4th Cir. 1986) is misplaced because the court held that it would apply the 50 percent rule to that specific case. Additionally, Carlile's reliance on *Shockley v. City of Newport News*, 997 F.2d 18 (4th Cir. 1993) is also misplaced because that case involved police officers, not retail store managers, who were not paid on a salary basis – something that is not at issue here.

[7] The FLSA recognizes the nature of retail business and states that "an employee of a retail or service establishment shall not be excluded from the definition of an employee employed in a bona fide executive or administrative capacity because of the number of hours in his work week which he devotes to activities not directly or closely related to the performance of executive or administrative activities." 29 U.S.C. § 213(a)(1).

9

87-88, 113, 134-35.) Thus, Carlile "remain[ed] responsible for the success or failure of the business operations under [his] management while performing the nonexempt work." 29 C.F.R. § 541.106. In other words, Carlile performed his nonexempt tasks in the context of his overall responsibility to ensure the store was profitable. *See Grace*, 637 F.3d at 516.

In *Grace*, the Fourth Circuit found the plaintiff "was performing management duties whenever she was in the store, even though she also devoted most of her time [99%] to doing the mundane physical activities necessary for its successful operation." 637 F.3d at 517. Similar to the plaintiff in *Grace*, even though Carlile contends that he devoted 90-95% of his time to performing nonexempt work, he was also the person responsible for running the store and performed his nonexempt tasks concurrently with his exempt managerial work. (Carlile Dep. at 87-88, 113, 134-35.) For example, Carlile admitted that even when he was doing non-managerial tasks in the store, he was concurrently responsible for the store's security by watching for shoplifters, providing customer service, and supervising and directing employees. (*Id.* at 88-89, 91.) Moreover, as contemplated by 29 C.F.R. § 541.700(c), Carlile had the discretion and flexibility to choose what tasks to perform himself and what tasks to delegate to other employees. (*Id.* at 73-74, 89, 168-69, 173.) Thus Carlile had a choice of which duties to perform, in contrast to a nonexempt employee who would simply perform the task to which he or she was assigned. (*Id.*) Carlile also had the authority and the ability to direct other employees to perform this nonexempt work. (*Id.* at 73-74, 89, 168-69, 173.)

While Carlile argues that management was not his primary duty because he spent the majority of his time engaged in manual labor, the regulations and the Court in *Grace* clarify that performance of these duties, in conjunction with overall supervision and management of the store, is not contrary to the application of the exemption. Thus,

10

Carlile's own testimony regarding his duties and tasks reflect that they were undeniably managerial in nature and easily meet the requirements of the executive exemption. *See Grace*, 637 F.3d at 508.

### b. The Relative Importance of the Managerial Duties as Compared with Other Types of Duties

Carlile's managerial duties were more important than the other duties he performed because they were critical to the operation of the store. In *Grace*, the plaintiff's managerial tasks, which included filling out paperwork, addressing customer complaints, working with employees on their schedules, and collecting cash, were critical to the operation of the store, as there was "*no one else at the site to direct these actions*." *Grace*, 637 F.3d at 517 (emphasis in original). Similarly, Carlile's managerial tasks, which included interviewing and employee screening (Carlile Dep. at 56-58, 93-94, 97, 141-44.), training (*Id*. at 67-69, 78, 97-99, 107-08.), store security (*Id*. at 88.), bank deposits and financial and sales paperwork (*Id*. at 54, 131-33, 138, 170-71.), scheduling (*Id*. at 104-05, 151-53.), and the overall supervision and direction of his employees, were critical to the operation of the store. (*Id*. at 73-74, 83-83, 88-89, 167-69.) In fact, Carlile's managerial duties were so important that employees frequently called him at home on his day off. (*Id*. at 156-57.)

While Carlile argues that he was under the direct supervision of his district manager, he nonetheless stated that the district manager visited the store only once every two weeks and stayed for approximately six hours at a time – not enough to direct the managerial tasks. (*Id*. at 47-48, 61, 83.) Therefore, because he was the only person running the store, the store could not have operated successfully without Carlile's handling of these managerial tasks.

11

### c. Relative Freedom from Supervision

Relative freedom from supervision does not demand complete freedom from supervision. In *Grace*, the plaintiff's supervising district manager typically visited the store once every two to three weeks. *Grace*, 637 F.3d at 517. The court also noted, apart from his supervision, which was not uncharacteristic for any retail operation, the district manager was not a "micro-manager who constantly was looking over [the manager's] shoulder." *Id*. The supervision of seventeen stores would hardly permit [the district manager] to micro-manage all of them. *Id*.; *see also Thomas v. Speedway Super America LLC*, 506 F.3d 496, 504-509 (6th Cir. 2007) (court found it significant that plaintiff's district manager was responsible for ten to twelve stores, as opposed to situations where a higher level manager was responsible for only a few stores).

Carlile was relatively free from supervision during the relevant time period. Carlile testified that his district manager, Rick Pardue, visited the store only once every two weeks and would only stay for approximately six hours at a time. (Carlile Dep. at 47-48, 61, 83.) Moreover, Family Dollar's records indicate that during the relevant time period, Carlile's district manager oversaw eighteen stores, including Carlile's store. (DeBrocq Decl. ¶ 7.) Though Carlile occasionally reviewed manuals containing certain Family Dollar guidelines and procedures and was also in contact with Pardue through regular conference calls, this does not equate to exacting supervision. In *Grace*, the Fourth Circuit held that the plaintiff was relatively free from direct supervision, despite her being in contact with her District Manager by telephone and email, and being subject to company policies, procedures, and budgetary requirements, as this type of supervision "was not uncharacteristic for any retail operation." 637 F.3d at 517. The infrequency of Pardue's visits and the large number of stores he was responsible for supervising

does not allow him to micro-manage each individual store. *See Grace*, 637 F.3d at 517; *Thomas*, 506 F.3d at 508.

### d. Relationship Between Salary and Wages Paid to Other Employees for the Kind of Nonexempt Work Performed by the Supervisor

To determine the relationship between a managerial salary and wages paid to nonmanagerial employees, the Fourth Circuit considered, first, whether the manager earned more, in absolute terms, than nonmanagerial employees and, second, whether the manager was a "profit center." *Grace*, 637 F.3d at 517. This second consideration asks whether the manager had the ability to influence the amount of her compensation. *Id*.

As to the first consideration, Carlile earned significantly higher amounts on an hourly basis than nonexempt workers. The record shows that of the twenty-six nonexempt employees who worked at Carlile's store during the relevant time period, twenty-three made $6 per hour or less and the highest paid nonexempt employee earned only $7.50 an hour. (DeBrocq Decl. ¶ 9.) Even using the highest hourly wage for those employees whose wages changed over time, nonexempt employees received an average hourly wage of only $5.77 per hour. (*Id*.) In comparison, Family Dollar's records indicate that Carlile worked an average of 70 hours per week. (*Id*. at ¶ 6.) Even setting aside his bonus payments, Carlile earned compensation, which when computed on an hourly basis, averaged between $12.07 and $12.94 per hour during the relevant time period. A review of these calculations reveals a significant difference in wages between Carlile and his nonexempt employees.

As to the second consideration, Carlile was a "profit center," his bonuses depended on his store's profitability and were directly tied to his performance in terms of sales, shrink, and inventory results. (Carlile Dep. at 70-71, 74, 110-11, 113.); *See Grace*, 637 F.3d at 517. Carlile earned bonuses of $2,313.82 in 2005, $2,646.87 in 2006, and $2,422.00 in 2007; bonuses for

which nonexempt store employees were not eligible. (*Id*. at 60,69-70; DeBrocq Decl. ¶ 5.)

Therefore, since Carlile had the ability to directly influence his own compensation, this factor is satisfied.

          e.        **Frequency With Which the Employee Exercises Discretionary Power**

While this factor is no longer an explicit factor in the "primary duty" analysis under the current regulations, the fact that Carlile exercised discretion virtually every day and all day long in his capacity as store manager supports that his primary duty was management. Carlile decided how to assign and apportion work among himself and his employees (Carlile Dep. at 101.); how to adjust the schedule (*Id*. at 104-05.); how to discipline employees (*Id*. at 83-89.); how to interview candidates (*Id*. at 56-59, 93-99.); and how to make sure the store ran safely (*Id*. at 10-11.); while at the same time satisfying customers. All of these tasks involved "discretionary acts inherent in being responsible for the successful operation of a retail store." *Grace*, 637 F.3d at 517. Moreover, the fact that Family Dollar maintains certain policies and procedures for the sake of consistency does not mean that Carlile failed to exercise discretion in enforcing these policies and procedures.[8]

        3.        **Customary and Regular Direction of the Work of Two or More other Employees**

To qualify as an executive, the regulations require an employee's primary duty to include the "customary and regular direction of the work of two or more other employees." 29 C.F.R. § 541.100(a)(3). "The phrase 'customary and regular' means a frequency that must be greater than

---

[8] *See Murray v. Stuckey's, Inc.*, 50 F.3d 564, 570 (8th Cir. 1995) (standardized procedures and policies may circumscribe but do not eliminate discretion of on-site store manager); *Thomas v. Speedway Super America LLC*, 506 F.3d 496, 507 (6th Cir. 2007) (manager still exercised discretion on a daily basis even though store had standardized operating procedures); *Grace v. Family Dollar Stores, Inc.*, 637 F.3d 508 (4th Cir. 2011) (manager still exercised discretion even though she was subject to company policies and the company template for a store in the Family Dollar chain).

occasional but which, of course, may be less than constant." 29 C.F.R. § 541.704. Carlile, on a daily basis, directed the work of his employees. (Carlile Dep. at 73-74, 88-89.)

Both sets of regulations also require the employee to direct the work of "two full-time employees or the equivalent." 20 C.F.R. § 541.104(a). The DOL has adopted an "80-hour rule" which generally requires an exempt executive to direct a total of eighty employee-hours of work each week. *See* 69 Fed.Reg. 22135; *see also Grace*, 637 F.3d at 513 (holding that Grace customarily and regularly directed the work of two or more other employees who worked eighty or more hours per week during 89.23% of the weeks that she was store manager). Carlile testified that he typically had five total employees in his store, and that on most days he had two assistant store managers and a cashier working with him. (Carlile Dep. at 99-101.) In addition, Family Dollar's records reflect that Carlile managed at least 80 employee hours 100% of the time he was a store manager during the relevant time period. (DeBrocq Decl. ¶ 8.) Therefore, Carlile customarily and regularly directed the work of at least two full-time employees and satisfies this factor.

### 4. Authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight

Finally, the additional prong of the executive exemption test contained in the current regulations states that an exempt employee has authority to hire *or* fire other employees *or* his recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100(a)(4). The DOL provides guidance with respect to whether an employee's recommendations satisfy this standard. Specifically, the "factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the

employee's suggestions and recommendations are relied upon." 29 C.F.R. § 541.105. Importantly, the employee's recommendations "may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have the authority to make the ultimate decision as to the employee's change in status." *Id*.

Carlile's deposition testimony establishes that he meets the additional prong of the executive exemption test contained in the current regulations, namely that his suggestions and recommendations as to the hiring and change of status of other employees were given particular weight. Carlile was actively involved in the interviewing and employee screening process. (Carlile Dep. at 56-58, 93-94, 97, 141-44.) If Carlile did not believe that a candidate would be a good fit at the store, he simply placed the candidate's application in a file at the store, rather than moving the candidate forward in the process by recommending the hire to his District Manager. (*Id*. at 56-58, 97, 143-44.) Carlile therefore effectively controlled which candidates moved forward in the hiring process. In addition, Carlile's District Manager closely followed Carlile's hiring recommendations. Carlile specifically recalled his District Manager following his recommendation regarding the hire of Assistant Store Manager Amy Bowen; in contrast, Carlile could not recall a single instance when his District Manager failed to follow his suggestion regarding hiring. (*Id*. at 57-58, 93-94.)

Furthermore, Carlile's District Manager closely followed his recommendations with respect to promotions. (*Id*. at 16-18, 94-96, 145, 165-66.) Carlile testified that based on his evaluation of their performance and his belief that they could handle the job, he recommended that Betty Brown, Amy Bowen, and Paula Missildine be promoted to Assistant Store Manager; recommendations which Carlile's District Manager followed. (*Id*.) Therefore, while Carlile may

16

not have had the ultimate decision making authority with respect to hiring, it is undisputable that he controlled the screening process and at least some of his recommendations as to hiring and promotion were closely followed, thereby satisfying the particular weight requirement.

## CONCLUSION

Looking at the facts in the light most favorable to the non-moving parry, the Court finds that Family Dollar has satisfied the DOL regulations qualifying Carlile as an exempt executive under the FLSA. No reasonable jury could find otherwise. Therefore, Family Dollar is entitled to judgment as a matter of law.

## ORDER

IT IS ORDERED that

(1) Defendant's Motion for Summary Judgment (Doc. No. 909) is GRANTED and Plaintiff Claude Carlile is dismissed;

(2) The Court finds that there is no just reason to delay finding of final judgment for Family Dollar with regard to Plaintiff Claude Carlile's claim against Family Dollar;

(3) The Clerk is directed to enter final judgment, pursuant to Rule 54(b), for Family Dollar with regard to Plaintiff Claude Carlile.

Signed: July 3, 2013

Graham C. Mullen
United States District Judge